IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SUSAN SMITH,                          )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )     CASE NO.  2:17-CV-00297-RAH
                                      )
OFFICE OF THE ATTORNEY                )
GENERAL, STATE OF ALABAMA,)
*a Governmental Agency, et al*.,      )
                                      )
        Defendants.                   )

## MEMORANDUM OPINION AND ORDER

Founded in 2011, the Special Prosecutions Division ("SPD") of the Office of

the Attorney General of the State of Alabama ("OAG") has always focused on

investigations of public corruption and white-collar crime. In so doing, it undertook

"one of the most challenging missions in law enforcement," at least according to its

first head, M. Matthew Hart ("Hart"). Dana Beyerle, *Public Corruption Alliance*

*Formed*, GADSDEN TIMES, Apr. 12, 2012.[1]  Since its founding, its investigators and

prosecutors have dealt with numerous high profile matters.

---

[1] District courts may take judicial notice of matters that are accessible to the general public and "are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Bryan v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  *See also U.S. ex rel Osheroff v. Humana, Inc*., 776 F.3d 805, 811 n.4 (11th Cir. 2015) (courts may take judicial notice of statements contained within—but not the veracity of—newspaper articles).

This pay and promotion discrimination case arises out of the hiring decisions made by the OAG when it first created the SPD. In staffing this new office, the OAG largely hired outside investigators with significant federal government work histories to the exclusion of long-term investigators already employed within the OAG. Susan Smith ("Smith" or "Plaintiff"), formerly employed with the City of Selma Police Department ("Selma PD"), was one of the passed-over investigators. In 2017, Smith filed this lawsuit against the OAG and Luther Strange ("Strange"), this state's former Attorney General and U.S. Senator, claiming gender discrimination in violation of the Equal Pay Act of 1963 ("EPA"), as amended, 29 U.S.C. § 206(d); Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*.; and 42 U.S.C. § 1983 ("Section 1983" or "§ 1983").

Discovery now at an end, the Defendants have moved for summary judgment on all claims in Smith's operative pleading ("Complaint") pursuant to the relevant provision of the Federal Rules of Civil Procedure,[2] as articulated in their motion and its supporting documents (collectively, "Motion"). (Doc. 51.)

With the Motion having been fully briefed and thus ripe for decision, for the reasons more fully set forth below, this Court GRANTS the Motion.

## I.   JURISDICTION AND VENUE

---

[2] In this Memorandum Opinion and Order, any and all references to "Rule []" or "Rules" are to one or more of the Federal Rules of Civil Procedure unless otherwise noted.

Subject matter jurisdiction is confered by 28 U.S.C. § 1331 as to Smith's federal causes of action. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on "the pleadings, the discovery and disclosure materials on file, and any affidavits." FED. R. CIV. P. 56(a), (c). A district court must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *E.g.*, *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). Just as importantly, that court cannot make decisions as to the merits of properly disputed factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see, e.g.*, *Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 622 n.18 (1973). A party asserting that a fact cannot be or is genuinely disputed can support such a statement by citing to particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323, 325.  Alternatively, the movant can do one of two things. It can contend that the materials cited do not establish the absence or presence of a genuine dispute. FED. R. CIV. P. 56(c)(1)(B); *Fuller v. SL Alabama, LLC*, 56 F. Supp. 3d 1232, 1236 (M.D. Ala. 2014).  Or, if it will not bear the burden of production at trial, it can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. FED. R. CIV. P. 56(c)(1)(B); *see also* FED. R. CIV. P. 56 advisory committee's note to 1963 amendment ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *E.g.*, *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence"

4

supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

In applying Rule 56, a court must heed two definitions. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Id.* at 248. As a matter of course, "[d]isputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment." *Kingsley v. Tellworks Commc'ns., LLC*, No. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at *14 (N.D. Ga. May 24, 2017). Meanwhile, an issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 77 U.S. at 250. Essentially, a genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc*., 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.   BACKGROUND

### A. Susan Smith

Smith presently is employed as a merit system-classified special agent at the OAG. (Doc. 1 at 2; Doc. 1-1 at 1.) She filed this suit against the OAG claiming discrimination on the basis of sex with respect to pay and promotion in violation of Title VII and the EPA and against Strange in his individual capacity under § 1983. In particular, Smith claims that the OAG paid her less than three former federal

investigators – Donald Keith Baker ("Baker"), James Murray ("Murray") and James Lambert ("Lambert") — all of whom ultimately were hired into the OAG between 2011 and 2013.

In her former job with the Selma PD, Smith held a variety of roles over a twenty-year period. (Doc. 52-10.) She was a patrolman, patrol sergeant, communications sergeant, detective sergeant, detective lieutenant, and chief of detectives. (*Id.*)  By the end of her tenure, she had accumulated over twelve years of experience in investigating various types of crime in the Selma area.  Her log of cases included violent misdemeanors and felonies, forgery, fraud, theft, and white collar matters.  (*Id.* at 9-15, 17.)  Notably, it had only one entry for a public corruption misdeed. (*Id.*)

Smith's employment with the OAG began in 2007.  She was hired into a merit-classified position as a "Special Agent-Attorney General/Ethics Option, Step 1" in the Investigations Division. (*Id.* at 18; Doc. 52-11.) This position started at a Step 1 pay level ($41,872.80 annually), which was an increase in salary from her previous position at the Selma PD ($39,665.60). (Doc. 52-10 at 16; Doc. 52-11 at 2; Doc. 52-14 at 3.)

After approximately six years as a special agent, Smith applied for a position as a "Senior Special Agent-Attorney General/Ethics Option" in January 2013. (Doc. 52-1 at 21.) Promotion to a new classification position within the OAG required an

employee to (1) turn in an application, (2) meet the minimum qualifications, (3) complete and pass any test necessary for the classification, (4) score high enough to appear in the top ten applicants on the employment register ("Certificate of Eligibles" or "COE"), and (5) be considered and selected from the COE. (Doc. 52-2 at 4-7); ALA. ADMIN. CODE R. 670–X–9–.02(1); ALA. CODE § 36–26–2(5). When seeking to fill a vacant position, the OAG, like any state agency, must request a COE from the State of Alabama Personnel Department in the classification, option, and location for the vacant position. (Doc. 52-2 at 6-7.) By law, the OAG cannot appoint a person to a merit position unless he or she appeared on the COE. (*Id.*)

Here, complications followed Smith's exam. After taking the examination, Smith was notified that she was listed as one of the ten individuals on the COE for the Senior Special Agent-Attorney General/Ethics Option position on January 15, 2014. (Doc. 22 at 2.)   However, she also was informed that the classification designation was being changed from Attorney General/Ethics Option to the Attorney General Option, which therefore required that she submit a new job application. (Doc. 52-10 at 63; Doc. 52-22 at 2.) An email sent on January 16, 2014, to all OAG staff from an OAG administrative services officer reiterated that the Senior Special Agent Attorney General/Ethics Option continuous job announcement had been cancelled due to the name change and that an open announcement for the Attorney General Option had been posted. (Doc. 52-23 at 2.)

After waiting over three months, Smith finally applied in April 2014 for the Senior Special Agent position. She was listed on both the Open Competitive Register (with a score of 90.0) and the Promotional Register (with a score of 90.09). (Doc. 52-1 at 28, 38; Doc. 52-24 at 3.)

Despite having applied in April 2014, Smith has not been promoted to a merit-classified Senior Special Agent position.  Furthermore, she has not been transferred into a better paying, but non-protected/non-merit (exempt), investigator position despite her requests to do so. Smith currently earns $52,665.60 as a Special Agent, having received several cost-of-living increases and step raises over the years. (Doc. 58-10 at 13.)

## B.    The Special Prosecutions Division and Attorney General Strange

Strange was elected Attorney General in 2010 on a campaign platform of targeting public corruption in the state.  (Doc. 52-6 at 18.)  Shortly after taking office in January 2011, Strange created the Special Prosecutions Division within the OAG to investigate and prosecute public corruption and high profile, white collar crimes. (*Id.* at   15, 18-20.) One of Strange's first hires was Hart, a long-time federal prosecutor with expertise in such cases — and was promptly assigned to head the SPD. (Doc. 52-7 at 19, 30; Doc. 52-8 at 2.)

Strange, along with Richard Allen ("Allen"), the Deputy Attorney General, and Hart, made a crucial choice in these early days. This trio decided to staff the

division with investigative staff who possessed high-level investigative experience in public corruption and white-collar crime. (Doc. 52-6 at 16.)  To obtain the best staff available, Strange authorized Allen and Hart to hire individuals outside the state merit system. (*Id.* at 15, 58, 63.)

C.    **Smith's Three Male Comparators**

Smith identifies three male comparators as the basis for her discrimination claims:

(1)    <u>Murray</u>: Prior to his employment at the OAG, Murray served over 22 years as a special agent with the Federal Bureau of Investigation ("FBI"). He had conducted investigations of high-profile, complex public corruption and intricate white-collar crimes involving, among others, a former governor and his chief of staff, an insurance executive, the former director of the Alabama Department of Transportation, the former president pro-tempore of the Alabama State Senate, two lobbyists, the former head of HealthSouth Corp., a chief of police, building inspectors and contractors. (Doc. 52-29 at 6-8.) During his last year at the FBI, Murray earned $133,000 annually.  (Doc. 52-25 at 7.)

In 2011, Murray was targeted for employment at the OAG by Allen due to his background in public corruption. (Doc. 52-25 at 6.) Murray made it known that he was interested in the position *if* his compensation was adequate and *if* he ultimately could transition to a merit system position for job protection purposes. (*Id.* at 6, 9.)

Murray was offered a non-merit[3] position in 2011 as an A.G. Special Investigator in the Investigations Division at a starting salary of $86,390.40.  (*Id.* at 8-9; *see* Doc. 52-26 at 2.)  In 2012, he was assigned to the newly created Special Prosecutions Division. (Doc. 52-8.)

In March 2013, Murray applied for a merit position as a Special Agent-Attorney General Option, the same merit position classification held by Smith. (Doc. 52-27.) Somehow, Murray learned that the OAG was "revamping" the Senior Special Agent position, and he therefore decided to wait until the position was advertised before applying for it. (Doc. 52-25 at 12.) Once the position was advertised in February 2014, Murray made his move and formally applied. (Doc. 52-29.) Murray took the examination for the Senior Special Agent position and ranked first on the COE with a score of 95.0. (Doc. 52-25 at 12; Doc. 52-30 at 2.)[4]

Murray was appointed to the Senior Special Agent-Attorney General Option position in April 2014 at an annual salary of $82,262.40. (Doc. 52-31 at 2.) He was still assigned to the SPD. (Doc. 52-25 at 12.) After completing his probationary

---

[3] Unlike a merit position, a non-merit position does not have the grievance protections otherwise afforded to a merit position.  Non-merit employees can be demoted, disciplined, dismissed or transferred for any nondiscriminatory reason. In other words, non-merit employees can be terminated at will.

[4] Smith has not alleged that the state personnel department engaged in any discrimination, had any improper motives, or that there was anything nefarious in designating Murray first on the COE for the Senior Special Agent position, although she does question the "unexplained" circumstances about the COE in her opposition brief to the OAG's motion for summary judgment. (Doc. 57 at 33-34, n. 150.)

period, Murray was appointed to an unclassified, non-merit position as an A.G. Special Investigator at a salary of $90,724.80.  (Doc. 52-37 at 2.)

(2)    Baker:  Prior to his employment at the OAG, Baker was employed as an accountant and then as a special agent with the FBI for twenty-five years, specializing in the investigation of complex public correction and financial crimes. (Doc. 52-38 at 11, 18.)  Because of this background, Baker initially was approached in 2011 by Murray and Hart to join the SPD.  (Doc. 52-38 at 11-12.)  After retiring from the FBI in 2013, Baker accepted a position at the OAG as a non-merit A.G. Investigator in the SPD, but only after he had negotiated a salary comparable to his FBI salary at retirement ($133,000) once the value of his federal retirement benefits were included.[5] (Doc. 52-38 at 12.)

Desiring a merit system position, one month later, Baker applied for a Special Agent-Attorney General Option position. Ultimately, he was appointed to the position in December 2013 at the Step 24 classification at an annual salary of $76,348.80. (Doc. 52-38 at 13; Doc. 52-41 at 2.)  The Step 24 designation afforded Baker a salary equal to the salary he was receiving in his unclassified, non-merit A.G. Special Investigator position. (Doc. 52-41 at 2.)

---

[5] For example, if Murray was earning $133,000 at the FBI and would receive $50,000 annually upon retirement from the FBI, he needed a salary with the OAG of no less than $83,000 to maintain a comparable level of compensation.

In October 2016, Baker transitioned back to a non-merit A.G. Special Investigator position and a higher salary. (Doc. 52-38 at 16-17.)  The impetus for this action was Baker's declared intention to consider moving into the private sector. (Doc. 52-38 at 16-17.)  Baker remained in the SPD throughout the duration of his employment with the OAG.

(3) <u>Lambert</u>: Prior to his employment with the OAG, Lambert was a special agent with the U.S. Department of Homeland Security ("DHS").  (Doc. 52-50 at 6.) Unlike Baker and Murray, Lambert was not directly recruited to serve in the SPD. (*Id.* at 8.) Wanting to be closer to family, Lambert applied for a position as a Special Agent-Attorney General/Ethics Option in July 2012, (Doc. 52-51 at 2), and was appointed to the position at the Step 1 level in February 2013, (Doc. 52-52 at 2), the same position classification and the same step level where Smith started in 2007. (Doc. 52-11 at 2; Doc. 52-52 at 2.)

Not long thereafter, Lambert applied for a Senior Special Agent position and took the requisite exam. Based on his performance, Lambert was listed third (tied with another individual) on the COE, with a score of 90.15.  (Doc. 52-58 at 2.) At the time, Smith also was listed on the COE with a score of 90.09, slightly outranked by Lambert (*id*.), but Lambert was appointed to the Senior Special Agent position at Step 1 on July 1, 2014, instead, (Doc. 52-59 at 2). According to Chief Investigator Tim Furman ("Furman"), Lambert was selected over Smith for several different

reasons, including his experience as a manager/supervisor, prior work with the federal government, a track record of "excell[ing] at the things he was doing" and taking the initiative to mentor other agents, and commendable scores in the interviews for the position. (Doc. 52-9 at 43.)

In February 2015, Lambert was transferred to an unclassified A.G. Special Investigator Position, thereby resulting in a significant pay increase to $76,348.80 annually. (Doc. 52-64 at 2.)  He subsequently was promoted to an unclassified position as A.G. Chief Investigator in December 2016. (*Id.*) Critically, at no time was Lambert assigned to the Special Prosecutions Division; at all times, Lambert remained assigned to the Investigations Division, as was Smith. (*Id.*)

### D. EEOC Charge and Claims

Smith filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on July 11, 2014, alleging gender discrimination and a violation of the EPA. The EEOC issued a Notice of Right to Sue letter on February 4, 2017. (Doc. 1-2 at 1.)  Smith timely filed her Complaint in this Court on May 5, 2017. In this pleading, Smith asserts the following counts:

Count I – Gender Discrimination under Title VII;

Count II – Violation of the EPA; and,

Count III – Strange's Violation, in his Individual Capacity, of Smith's Constitutional Rights under Section 1983.

## IV. DISCUSSION

### A. Smith's Wage Discrimination Claims

The Court will first address Smith's EPA claim and then her Title VII pay discrimination claim.

### 1.      Smith's Prima Facie Burden Under the EPA.

The EPA prohibits employers from discriminating on the basis of sex by paying employees of different sexes different rates for the same work. 29 U.S.C. § 206(d)(1). To establish a prima facie case of discrimination under this statute, a plaintiff must show that his or her employer "pays different wages to employees of opposite sexes for equal work on jobs" the performance of which requires "equal skill, effort, and responsibility, and which are performed under similar working conditions." *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974), and 29 U.S.C. § 206(d)(1)). The initial burden to demonstrate comparability is "fairly strict"; although the jobs compared need not be identical, a plaintiff must demonstrate "that she performed substantially similar work for less pay." *Miranda v. B&B Cash Grocery Store, Inc*., 975 F.2d 1518, 1526 (11th Cir. 1992); *see also Waters v. Turner, Wood & Smith Ins. Agency, Inc*., 874 F.2d 797, 799 (11th Cir. 1989) ("The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high.").

Because a prima facie case does not require a showing of an employer's discriminatory intent, the EPA "prescribes a form of strict liability." *Miranda*, 975 F.2d at 1533. "Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant." *Id.* (citing *Mitchell v. Jefferson Cnty. Bd. of Educ.*, 936 F.2d 539 (11th Cir. 1991)).

Pointing to these standards, the OAG argues that Smith cannot meet her prima facie burden because she cannot show the OAG paid Murray, Baker and Lambert, the three male investigators, more for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and that are performed under similar working conditions. (Doc. 53 at 30-31.) Baker and Murray, the OAG contends, are not proper comparators because Smith worked as an investigator in the general investigative division, which primarily investigated violent crimes and crimes against women and children, and this duo worked in the SPD, which required investigators to perform financial analysis, review large volumes of financial records, track financial records, and investigate high-profile public corruption and white collar crimes. (*Id.* at 30-31.) As part of their work, Baker and Murray also assisted with grand juries, recruited white collar informants, and evaluated telephone records, electronic communications, credit card records, and suspicious activity

reports ("SAR") filed with the Financial Crimes Enforcement Network. (Doc 53 at 31.) As an example of the disparity in qualifications, the OAG points to deposition testimony by Smith in which she acknowledged that she has never used a SAR and does not know how to download cell phone information.  (*Id.*)

As to Lambert, he too cannot be a proper comparator because he received the same starting salary as Smith when he began his employment with the OAG. (*Id.*) Further, Lambert's pay disparity occurred only when he was promoted to a different, senior-level position as Senior Special Agent, a post that included additional supervisory duties.

Smith, of course, disputes these purported distinctions.  She maintains that her job as a special agent in the Investigations Division was "substantially equal" to the jobs of Murray and Baker in the SPD. (Doc. 57 at 22.)   Smith makes no argument in this regard as to Lambert. Curiously, Smith does not state for which period of time her job as a special agent was equal.[6] With this in mind, this Court must first determine whether Smith's job is substantially similar to those of her alleged comparators. In so doing, its focus is on the primary duties of each job, not on the individual employees holding those jobs, or on incidental or insubstantial responsibilities. *Miranda*, 975 F.2d at 1533 (noting that "the controlling factor under

---

[6] The Court thus assumes this was the period of time that both Murray and Baker were assigned to the SPD.

the Equal Pay Act is job content") (quotation omitted). "[A]n EPA plaintiff must show she and her comparator hold not only similar job titles and classifications but the actual job requirements and performance requirements are substantially equal." *Kohser v. Protective Life Corp.*, No. 2:11-CV-03915-JHE, 2015 WL 1395896, at *19 (N.D. Ala. Jan. 13, 2015), *report and recommendation adopted as modified*, No. 2:11-CV-3915-VEH, 2015 WL 1395911 (N.D. Ala. Mar. 25, 2015), *aff'd*, 649 F. App'x 774 (11th Cir. 2016) (rejecting plaintiff's argument that her job was substantially similar to her alleged male comparator because the two employees were hired at the same grade level). To decide whether a plaintiff has met her initial threshold, a court should not (and the Court will not) ignore that party's obligation to prove that the skill, effort, and responsibility required in the performance of the jobs are "substantially equal." *Miranda*, 975 F.2d at 1533.

As already noted, *see supra*, the standard for determining equality of the requisite "skill, effort, and responsibility" of the job at issue is "high." *Waters*, 874 F.2d at 799. An EPA plaintiff's burden of proving equivalence is greater than the comparison that must be made to support a Title VII claim. *Miranda*, 975 F.2d at 1526. Although formal job titles or descriptions may be considered, attention must be fixed on the job content and actual duties that the employees are called upon to perform. *Id.* at 1533; *see also Arrington v. Cobb Cnty.*, 139 F.3d 865, 876 (11th Cir. 1998) ("[T]he controlling factor in the court's assessment of whether two jobs are

substantially equal must be actual job content."). Thus, the skills and qualifications of the comparators and any incidental job duties are not relevant to this analysis. *See Miranda*, 975 F.2d at 1533.

Viewed as a whole, from first spoken word to final quip, the testimony of Smith, her supervisors, and the two male comparators (Murray and Baker) demonstrates that Smith's job did not entail the same "skill, effort, responsibility, or working conditions" as the jobs that her proffered comparators held. Smith's job primarily consisted of investigating crimes of violence and crimes against women and children, (Doc. 52-10 at 24, 29; Doc. 52-6 at 38), but not public corruption, (Doc. 52-6 at 52; Doc. 52-48 at 14). While such cases can try the hardiest and implicate their own unique legal complexities, public corruption and similar such crimes are a different animal entirely; their intricacies and complications are distinct in kind, if not degree, demanding a different, but neither better nor worse, set of forensic skills. A lawyer or detective trained for or mostly familiar with one—and who has excelled in that particular area of law—will not necessarily possess the expertise required to thrive in the other, at least without some extended and specialized training. With investigators and prosecutors, as with many lawyers, acumen does not always translate, at least not immediately. Indeed, while Smith had a background performing generalized investigative work at the Selma PD, Murray

and Baker both had backgrounds in regularly investigating complex financial crimes and public corruption cases at the FBI.

"A distinction should be made between (on the one hand) standard experience, training, or education required for a position and possessed by all individuals in that position, and (on the other hand) any additional or unique experience, training, or education not required for a position but that an individual may bring to the table." *Morris v. Bessemer City Bd. of Educ*., No. 2:08-CV-1086-JHH, 2009 WL 10688079, at *18 (N.D. Ala. Nov. 5, 2009). While investigative functions for special agents at the OAG (or even at the FBI or local law enforcement agencies) may indeed be somewhat "comparable," they are most certainly not "virtually identical," which is required to prove an EPA prima facie case. *See*, *e.g*., *Waters*, 874 F.2d at 799 ("When Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that "the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other."). Indeed, the need for experienced individuals to investigate crimes of a singularly complex nature was the very reason the OAG gave for forming the SPD in the first place.

Although Smith, Murray and Baker all investigated crimes for the OAG, the complexity and level of investigation is what distinguishes Smith's general investigatory practice in the Investigative Division from Murray and Baker's higher-profile public corruption and white collar investigatory practice in the Special

Prosecutions Division. Most if not all investigative jobs will include similar activities, but those activities do not *define* the job—rather, they are generally inherent in every law enforcement investigator position. If Smith's argument was correct, the EPA would require that every OAG investigator be paid the same; naturally, the EPA's reach is not that broad. Numerous courts in this Circuit have rejected this type of "similar core function" theory, and the Court will now do the same. *See Cochran v. Alabama Power Co.*, No. CV 16-00193-CG-B, 2017 WL 2223038, at *6 (S.D. Ala. May 19, 2017); *Rollins v. Alabama Cmty. Coll. Sys.*, 814 F. Supp. 2d 1250, 1315 (M.D. Ala. 2011); *Byrd v. Auburn Univ. at Montgomery*, No. CIVA 2:05-CV-835 CSC, 2007 WL 1140424, at *9 (M.D. Ala. Apr. 17, 2007). Accordingly, the Court concludes that Smith's job duties as a special agent in the Investigations Division were not virtually identical to those of Murray and Baker in the SPD, and therefore the OAG is entitled to summary judgment on Smith's EPA claim on this basis alone.

## 2.  The OAG's Affirmative Defense

The OAG makes an alternative counter: that even if the job duties were substantially equal and that Smith could prove a prima facie case, the disparities in salaries were justified by the "any factor other than sex" inquiry. In particular, the OAG cites to Murray and Baker's unique investigative experience in legislative and

public corruption and their prior salaries to justify the pay disparity between them and Smith.  (Doc. 53 at 31.)

Where a plaintiff makes a prima facie showing under the EPA, a defendant "may avoid liability by proving by a preponderance of the evidence that the pay differences are based on . . . any other factor other than sex." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003) (citing 29 U.S.C. § 206(d)(1)). This is an affirmative defense, and a defendant's burden of proof is "heavy," in the sense that the employer "must demonstrate that the factor of sex provided no basis for the wage differential." *Id.* (citations and internal quotation marks omitted). If a defendant satisfies its burden, a plaintiff must rebut the explanation by showing with affirmative evidence that the reason is pretextual or offered as a post-event justification for a gender-based differential. *Id.* (citing *Irby* , 44 F.3d at 954). If a plaintiff's rebuttal is sufficient to create an inference of pretext, a material issue exists that must be resolved at trial. *Irby*, 44 F.3d at 954.

The Eleventh Circuit has found factors "other than sex" justifying pay differentials to include "unique characteristics of the same job; . . . an individual's experience, training or ability; or ... special exigent circumstances connected with the business." *Id.* at 955 (citing *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)). "So long as subjective business justifications...are not overly subjective so as to render them incapable of being rebutted, they are legitimate

factors to be considered." *Schwartz v. Fla. Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991).

Here, the OAG argues the "other factors" stem from Baker's and Murray's prior salaries as FBI agents in combination with their "unique legislative corruption or public corruption experience." (Doc. 53 at 31.) "[P]rior pay plus experience establishes an affirmative defense under the EPA." *White v. ThyssenKrupp Steel USA, LLC*, 743 F. Supp. 2d 1340, 1354 (S.D. Ala. 2010); *see Irby*, 44 F.3d at 955 ("While an employer may not overcome the burden of proof on the affirmative defense of relying on 'any other factor other than sex' by resting on prior pay alone . . . there is no prohibition on utilizing prior pay as part of a mixed-motive, such as prior pay *and* more experience."). Since prior pay plus experience constitutes "other factors," the burden now shifts to Smith to rebut this explanation by showing that the OAG's stated justification is pretextual. *See Schwartz*, 954 F.2d at 623; *Edwards v. Fulton Cnty., Ga.*, 509 F. App'x 882, 885 (11th Cir. 2013). Again, Smith is not required to prove discriminatory intent on the part of the OAG. *See Miranda*, 975 F.2d at 1533. If she is able to create the inference of pretext, an issue that should be reserved for trial has been found, fatally undermining any Rule 56 attack. *Irby*, 44 F.3d at 954.

While Smith argues that the OAG, through Strange, has not met its burden because Strange had no recollection in his deposition of the basis for Murray's and

Baker's starting salaries, (Doc. 57 at 26-27), by hanging her hat on Strange's forgetfulness, Smith effectively distorts the full picture. Allen, the former Chief Deputy Attorney General, testified that he recruited Murray, in part, by using "the flexibility with respect to salary attendant to the unclassified positions to help the OAG obtain the services of exceptional investigators, like Murray, with significant experience in white-collar crime investigations and public corruption investigations." (Doc. 52-4 at 4.) Allen further explained that without the flexibility in the unclassified positions, he would not have been as successful in recruiting qualified people. (*Id.*) Hart, head of the SPD, confirmed that the non-merit hiring process allowed the division to get "more senior people" into the office because "it allows you to pay them more money, and that's what required. When they're making 170 grand with the FBI, they're not leaving there for $55,000. That's not going to happen." (Doc. 52-7 at 44.)

Although Smith also argues that Murray's and Baker's prior salaries with the FBI and their requests for comparable salaries at the OAG, as a condition of employment by themselves, cannot serve as legitimate factors for the pay disparity, (Doc. 57 at 27), this position fails to obscure two basic truths. First, without question, Murray and Baker had salaries significantly higher than Smith in the year preceding their employment at the OAG. Second, both individuals made it known that they had no interest in positions at the OAG if their overall compensation was not

commensurate with what they were earning at the FBI. Significantly, Murray and Baker earned these prior salaries while working for an altogether different governmental investigatory agency where their corruption and white-collar work was highly sophisticated. Therefore, the concern of institutionalizing pay discrimination is not nearly as great as it would be if, for example, Murray and Baker had been inter-agency transfers from within Alabama state government; that is, they both came from employers outside the OAG and Alabama state government with a high degree of relevant and sought-after experience. *Compare Joyner v. Town of Elberta*, 22 F. Supp. 3d 1201, 1208 (S.D. Ala. 2014) (no EPA violation where experienced police officer brought in as permanent chief of police to replace female temporary chief due to male officer's extensive experience), *with Arrington v. Cobb Cnty.*, 139 F.3d 865, 876 (11th Cir. 1998) (possible EPA violation in promotion of male firefighting officers both of whom came up through the ranks in same department as female officer, where there was no showing officers had significantly better experience than female officer). Moreover, the fact that both Murray and Baker required compensation similar to their previous FBI salaries renders this issue's resolution even clearer. *See Hankins v. Title Max of Ala., Inc*., No. CIV.A.05 AR 00905 S, 2006 WL 4393576, at *6 (N.D. Ala. Sept. 26, 2006) (negotiation of starting salary a factor in evaluating EPA "any factor other than sex" test).

Considering the foregoing, even though Smith may believe her time with an Alabama municipal police department equals federal criminal investigatory experience with the FBI,[7] at bottom, all Smith is doing is "quarreling with the wisdom" of the OAG's hiring reasons. *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Such personal offense at the OAG's stated justifications is insufficient to support the conclusion that the OAG's reasons were "pretextual or offered as a post-event justification." *Irby*, 44 F.3d at 954. Here, those reasons have anchors throughout this matter's evidentiary record. That Smith also condemns Baker as a flawed investigator who should not command a higher salary because of events that transpired, *inter alia*, during a high-profile criminal trial in the Middle District of Alabama in 2011,[8] (Doc. 57 at 10), cannot obviate this conclusion by engendering an inference of pretext as it concerns the OAG's stated justifications of previous pay and federal experience.

In sum, the Court finds that the evidence clearly shows that the pay differential between Smith, Murray and Baker was justified by the prior pay of Murray and

---

[7] Commissioner Frank Reagan of the New York City Police Department, of the show *Blue Bloods*, would disagree.

[8] Specifically, Smith asserts that Baker's ability to effectively participate in federal criminal trials as a part of his job with the Special Prosecutions Division was adversely impacted by "Giglio" issues resulting from his past indiscretions. *See generally Giglio v. United States*, 405 U.S. 150 (1972) (prosecution's failure to inform the injury that a witness had been promised not to be prosecuted in exchange for his testimony was a failure to fulfill the duty to present all material evidence to the jury, and constituted a violation of due process).

Baker, by Murray's and Baker's demands for compensation commensurate with their FBI employment, and by their FBI experience, which clearly are differentials based on factors "other than sex." *See Irby*, 44 F.3d at 954. Since Smith says nothing as to Lambert, the Court concludes that Smith concedes that Lambert is not a proper comparator for EPA purposes.  For this additional reason, Smith's EPA claim fails.

### 3. Smith's Title VII Pay Discrimination Claim

To succeed on her Title VII pay discrimination claim, Smith must show (1) that she is a member of a protected class; (2) that she was qualified for her job; (3) that she suffered an adverse employment action; and (4) that her employer treated similarly situated employees who are not members of the protected class more favorably. *Reddy v. Dep't of Educ., Ala.*, No. 18-14433, 2020 WL 1623497, at *7 (11th Cir. April 2, 2020).  Disparate pay is an adverse employment action under Title VII. *Bowen v. Manheim Remarketing, Inc*., 882 F.3d 1358, 1364 (11th Cir. 2018).

While wage discrimination is forbidden under both Title VII and the EPA, a Title VII plaintiff's task of establishing a prima facie case is in some respects easier because she is not required to meet the exacting burden of showing virtually identical jobs. *Washington Cty. v. Gunther*, 452 U.S. 161, 170-71, 181 (1981). Of course, under Title VII case law, the plaintiff does have the burden of showing that she and the alleged comparator employees are similarly situated. The Eleventh Circuit recently clarified that a plaintiff must demonstrate that she and her proffered

comparators are "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019). A similarly situated comparator will (1) have engaged in the same basic conduct as the plaintiff; (2) will have been subject to the same employment policy or guidelines; (3) will have been working under the same supervisor; and (4) will share the plaintiff's employment or disciplinary history. *Id*. at 1227-28. When determining whether an individual is a proper comparator, federal courts examine, *inter alia*, the amount of years an individual has worked for the employer and the individual's type of expertise. *See Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008); *Davis v. Dunn Constr. Co*., 872 F. Supp. 2d 1291, 1310 (N.D. Ala. 2012). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1224-25.

The OAG gives a multitude of reasons for why Smith cannot meet her prima facie of presenting a similarly situated male comparator.  The OAG first focuses its attention to Lambert, noting that when he was hired as a special agent his pay was identical to that of Smith, a fact that Smith does not dispute. The OAG then goes on to assert that Smith's and Lambert's salaries diverged only when Lambert was promoted to an altogether different position as a Senior Special Agent. That job promotion alone was sufficient to make Lambert dissimilar to Smith because Smith

would be basing her pay disparity on her position as a Special Agent when compared to an employee who was a *Senior* Special Agent. That is, one cannot properly compare *Senior* Special Agent Lambert to Special Agent Smith because they were not subject to the same employment guidelines and duties and did not share the same employment history. *See Lewis*, 918 F.3d at 1227-28.

The OAG next denies that any of the proffered comparators could qualify as such, as all had different work histories and experience from Smith. Specifically, at least as the OAG sees it, Smith's pre-OAG work history with the Selma PD is structurally different from the federal work histories and experience of Murray, Baker, and Lambert — Murray and Baker with the FBI, and Lambert with DHS. (Doc. 53 at 37.) Murray, for one, had experience in investigating not just ordinary crimes but also high-profile, complex public corruption and white-collar crimes. (*Id.*) Like Murray, Baker investigated similar crimes, with added experience in financial crimes. Lambert, while not previously an agent with the FBI, was employed with DHS as a Supervisory Special Agent. According to the OAG, these individuals' work experience and histories were needed for purposes of staffing the SPD, a new division in 2011 whose primary focus was high profile, complex public corruption, white collar and financial crimes.

Based on their history, as recounted above, the Court agrees that these individuals are not proper comparators for purposes of Smith's prima face case under

Title VII, especially as it concerns Murray and Baker, because of their different employment experiences and histories. *See Lewis*, 918 F.3d at 1228; *Earle v. Birmingham Bd. of Educ.*, No. 2:18-CV-697-GMB, 2020 WL 470285, at *4 (N.D. Ala. Jan. 29, 2020); *Gaines v. Cooper*, No. 2:17-CV-01406-AKK, 2019 WL 2514935, at *6 (N.D. Ala. June 18, 2019). Therefore, Smith's wage discrimination claim under Title VII necessarily fails.

Nevertheless, assuming arguendo that Smith has established a prima facie case, the OAG must tender a legitimate, non-discriminatory reason for the pay disparity. *See Meeks v. Computer Assocs. Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)). If the OAG advances a legitimate, non-discriminatory reason, Smith must then establish by a preponderance of the evidence that the proffered justifications are actually a pretext for discrimination. *See Miranda*, 975 F.2d at 1528-29.

In this regard, even if Murray, Baker or Lambert were proper comparators, Smith still cannot rebut the OAG's legitimate, nondiscriminatory reasons for their salary disparity, namely their qualifications and pay at previous employers, so maintains the OAG. (Doc. 53 at 37-38.)

Because a difference in qualifications is a legitimate reason for a pay disparity, *Brooks v. Cnty. of Comm'n of Jefferson County, Alabama*, 446 F.3d 1160, 1162 (11th

Cir. 2006), as is previous pay, but not standing alone, *see White v. ThyssenKrupp Steel USA, LLC*, 743 F. Supp. 2d 1340, 1354, n.22 (S.D. Ala. 2010), the burden now shifts to Smith to show these reasons were pretextual.

Briefly stated, Smith may demonstrate pretext by showing that the OAG's proffered reason for an adverse employment action is a "coverup" for a discriminatory decision. *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). A reason is pretextual only if it is shown both that it is false and the true reason for the employment decision is discrimination. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007). In other words, Smith must show that a discriminatory reason more likely than not motivated the OAG to pay her less. *See Miranda*, 975 F.2d at 1529.  She must "meet [the proffered] reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Brooks*, 446 F.3d at 1163. The Eleventh Circuit has explained that unfair treatment, absent discrimination based on membership in a protected class, is not an unlawful employment practice under Title VII. *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).

The Court's analysis of pretext here primarily is the same as that for Smith's EPA claim; indeed, they are somewhat merged. (Doc. 57 at 33-37.)  In any event, the Court notes that Smith's citations to *Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095 (11th Cir. 2001), *abrogated on other grounds by Burlington N.*

& *Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2005), *as recognized in Crawford v. Carroll*, 529 F.3d 961, 971, 973 (11th Cir. 2008), and *Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, No. 2:06-cv-321-ID, 2007 WL 3124452 (M.D. Ala. Oct. 25, 2007), regarding the OAG's pretextual reasons for paying Lambert at a higher rate, are unavailing. To begin, *Bass* is factually distinguishable from this case; there, the employer proffered only one reason for not hiring the plaintiff, and that was the interview. 256 F.3d at 1105. Here, the OAG's main proffered reasons for promoting Lambert and paying him more are his supervisory experience at DHS, his initiative in helping other agents, and his interview. As the Supreme Court stated in *Burdine*, that explanation is "clear and reasonably specific." 450 U.S. at 258. Smith's citation to *Blackledge*, arguing that the numerical scores given to Lambert are too generic, again disregards Lambert's superior qualifications. That is a far cry from the tableau of inconsistent reasoning provided by the employer in *Blackledge*. 2007 WL 3124452, at *22–25.

Smith thus has failed to offer any record evidence showing that the OAG's proffered reason for paying Murray, Baker and Lambert a higher salary was motivated by discriminatory animus based on Smith's gender. While it may have been unfair that Smith had years of prior experience with the Selma Police Department yet was paid less than others in "investigatory" positions, unfair treatment absent discrimination is not an unlawful employment practice under Title

VII. *See Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, 743 F. App'x 269, 275 (11th Cir. 2018); *Coutu*, 47 F.3d at 1074-75. Thus, the OAG is due summary judgment on Smith's wage discrimination claim under Title VII.[9]

### B. Smith's Title VII Failure to Promote Claim

#### 1. Mixed-Motive

As to this issue, Smith's position is somewhat murky. For its part, the OAG argues that Smith improperly has asserted a mixed-motive claim for the first time in her brief opposing summary judgment and that she did not give notice of such a claim in her Complaint. According to the OAG, Smith should hence not be permitted to inject a mixed-motive claim into the case at the last second. The Court disagrees because the Complaint takes no position as to whether Smith is advancing a single-motive or mixed-motive Title VII failure to promote claim. Consequently, the Court assumes that Smith has asserted a mixed-motive Title VII claim and examines the merits of that claim in turn.

"[A]n adverse employment action motivated by both legal and illegal reasons constitutes actionable discrimination under Title VII." *Quigg v. Thomas Cty. Sch.*

---

[9] Smith alluded to the alternative "convincing mosaic" analysis in her brief opposing summary judgment, albeit in the portion of the brief discussing the OAG's mixed-motive failure to promote claim. (Doc. 57 at 31.) Even assuming this argument was properly briefed vis à vis Smith's Title VII pay discrimination claim, suffice it to say, Smith has not met the *Lockheed-Martin Corp.* standard either. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1341 (11th Cir. 2011). For one, she has not shown any clear indication that the OAG "consciously injected" gender consideration into salary decisions or that the OAG had a substantial incentive to make gender-conscious salary decisions. *See id.*

*Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e–2(m)). A plaintiff "can prove a mixed-motive case with direct or circumstantial evidence." *Id.* at 1237 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003)).

However, it is improper to use the *McDonnell Douglas* framework to evaluate a mixed-motive claim at the summary judgment stage. *Quigg*, 814 F.3d at 1238. Rather, "[t]o avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was a motivating factor for the [employer]'s adverse employment action." *Bowen*, 882 F.3d at 1364  (quoting *Quigg*, 814 F.3d at 1239) (emphasis in original) (internal quotation marks omitted). "In other words, the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." *Quigg*, 814 F.3d at 1239 (internal quotation marks omitted) (bracketed text in original). Because this case turns on circumstantial evidence, the Court examines whether Smith has presented sufficient

evidence to support a mixed-motive claim.

Because, as for the first prong, denial of a promotion based on sex is an adverse employment action under Title VII, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001), the Court will proceed to examine Smith's claim that gender was a motivating factor for being denied the position. Smith offers the following evidence in support of her mixed-motive claim: that like Lambert, she requested a position reclassification and a pay raise, both of which were granted to Lambert but not her; that a fellow investigator, Donna Clayton, was "maxed out" on the merit pay scale and was treated as "complacent and willing to settle"; and that Tracey Edwards, another special agent, complained about gender discrimination at the OAG. (Doc. 57 at 31-33.) Smith then grafts a "convincing mosaic" analysis onto the *Quigg* mixed-motive framework's second prong, asserting that these assorted circumstances show that Smith's gender was a discriminatory motivating factor in the OAG's refusal to promote her. *See Lockheed-Martin Corp*., 644 F.3d at 1328 (discussing the "convincing mosaic" alternative analysis to the traditional *McDonnell Douglas* framework).[10]

The proffered evidence fails to create a genuine issue of material fact that the

---

[10] Smith may be conflating the single-motive and multiple-motive analyses. *See Williams v. Hous. Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 454, n. 4 (11th Cir. 2019). In any event, out of an abundance of caution, the Court analyzes Smith's Title VII claims under the single-motive framework as well.

OAG actually relied on Smith's gender in making its hiring and promotion decisions. *See Quigg*, 814 F.3d at 1241. Although not always necessary for a mixed-motive claim to proceed, Smith has not, for example, alleged that the decisionmakers made any statements that suggested gender-based bias or that bias factored into their decisional process. *See id.* ("Statements by the board's members or others involved with the board's decisional process that suggest bias can serve as evidence of discrimination."). In essence, Smith has only proffered "otherwise anecdotal information" to show the OAG's discrimination. *See Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1014 (11th Cir. 2019) (citing *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) ("Statistics without any analytical foundation are virtually meaningless."). Because Smith has failed to provide sufficient evidence for a reasonable jury to conclude that her gender was a motivating factor for her denial of a promotion, her mixed-motive claim is due to be dismissed. *See Quigg*, at 1239.

### 2.    Single-Motive

Even if analyzed under a single-motive framework, the result is the same. Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Because Smith does not

contend that there is any direct evidence to support her Title VII claim, this single-motive claim must be evaluated under the familiar *McDonnell Douglas* scheme. Under this burden-shifting framework, "a plaintiff first must make out a prima facie case of discrimination that 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Flowers v. Troup Cty., Ga. Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Burdine*, 450 U.S. at 254).

To survive summary judgment on a Title VII failure to promote claim, the plaintiff must demonstrate that: (1) she belonged to a protected class; (2) she was qualified for and applied for a position; (3) despite qualifications, she was rejected; and (4) the position was filled with an individual outside her protected class. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005).

For the OAG, summary judgment is appropriate on Smith's Title VII single-motive claim because Smith has failed to establish the second and forth elements: that she was qualified for the job and that there was an employee outside her protected class who was treated more favorably. In her response, Smith says not so, at least if based on an interpretation of her claim under a mixed-motive analysis. (Doc. 57 at 31.)  Since the OAG argues for summary judgment under the single-motive analysis and since Smith fails to address it, the Court concludes that Smith has abandoned and waived this claim to the extent it was ever asserted. *See Gailes v. Marengo Cnty. Sheriff's Dep't*, 916 F.Supp.2d 1238, 1241-42 & n.6 (S.D. Ala.

2013)(collecting cases). But even if Smith had properly raised the single-motive analysis, the OAG still would be entitled to summary judgment.

First, as it concerns the failure to promote claim against Murray's hiring as a Senior Special Agent in April 2014, the OAG's argument – that Smith was not qualified for the position as was Murray because Smith was not on the COE in April 2014 unlike Murray—is correct.  As the evidence before the Court shows, the OAG could only hire for the Senior Special Agent position from the list of individuals found on the COE at that time. At the time of Murray's hiring in April 2014, he was on the COE but Smith was not. As such, as between the two, only Murray was qualified, and any claim regarding Murray's hiring as a Senior Special Agent over Smith in April 2014 is not actionable.

Next comes Lambert, a more convoluted case. While Smith may not have been on the COE in April 2014 when Murray was hired, she was on the COE in July 2014 when Lambert was hired as a Senior Special Agent.  As such, at that time, she was qualified for the job and therefore can meet her prima facie case on that element. But, as to Lambert, the OAG does not actually contend that Smith cannot meet her prima facie case but instead focuses on the second factor of the *McDonnell Douglas* framework, *i.e.*, that it had legitimate, nondiscriminatory reasons for promoting Lambert over Smith. (Doc. 53 at 35.)  In so spinning, the OAG apparently concedes that Smith can meet her prima facie case when it comes to Lambert.

Regardless, according to the OAG, Lambert was hired over Smith because he was more qualified and demonstrated, through "his supervisory experience at DHS, his initiative to help other agents while a Special Agent, and his strong interview for the Senior Special Agent position." (*Id.*) The OAG also points to the fact that Lambert was ranked higher on the COE. (*Id.*)

The Court agrees with the OAG. To be sure, the OAG does not contend that Smith was not qualified for the position of Senior Special Agent at the time Lambert was hired for the position. Instead, the OAG simply argues that Lambert was more qualified due to a host of factors. For her part, Smith does not really argue that she was more qualified than Lambert. On this issue, *Burdine* gives an answer: "an employer has discretion to choose among equally qualified candidates, provided the decision is not based on unlawful criteria." 450 U.S. at 248. Logically enough, the Eleventh Circuit has recognized that an employer's hiring of a more qualified candidate constitutes a legitimate reason that then shifts the burden to the plaintiff to show pretext. *Brooks*, 446 F.3d at 1163. Bound by this case law, this Court agrees that the OAG's stated reasons constitute legitimate nondiscriminatory reasons for hiring Lambert over Smith.

Now bearing the burden of presenting evidence that these reasons were a mere pretext, Smith opts for one fact: that when Lambert applied for a Senior Special Agent position, the OAG "ignored the requirements of three years' of evaluations

for merit system employees" and manipulated the selection process. (Doc. 57 at 34.) In Smith's telling, this "pre-selection" shows that Lambert was pre-chosen for the position, thereby demonstrating that the OAG had engaged in verboten gender discrimination. Smith cites *Goostree v. State of Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986), for the proposition that such pre-selection displays discriminatory intent. Rather meekly, the OAG counters that in the Eleventh Circuit, pre-selection at best can serve as "relevant evidence" of discrimination. *See Springer v*, 509 F.3d at 1350; *Blackledge*, 2007 WL 3124452, at *24.

Here too the law is clear. As the Eleventh Circuit has stated, "where preselection violates [employer] personnel policies, it does not necessarily indicate [illegal] discrimination." *Springer*, 509 F.3d at 1350. And again, it is not at all clear that pre-selection was even afoot here, for Lambert had other qualifications (i.e., his DHS experience) the OAG found desirable in promoting him, even besides scoring ahead of Smith on the COE. Therefore, Smith has failed to demonstrate that the OAG's stated reasons for promoting Lambert were pretextual, and summary judgment is granted to the OAG on this claim as well.

### C.   Smith's Section 1983 Claim Against Strange.

Finally, the Court turns to Smith's claims that Strange, in his individual capacity, discriminated against Smith in her pay and by failing to promote her in

violation of the Equal Protection Clause of the Fourteenth Amendment, as enforced against state officials through § 1983.

"[W]hen section 1983 is used as a parallel remedy for violation . . . of Title VII, the elements of the two causes of action are the same." *Underwood v. Perry Cnty. Comm'n,* 431 F.3d 788, 793 (11th Cir. 2005) (internal quotation marks and citations omitted). Because Smith's Title VII pay discrimination and failure to promote claims against the OAG fail, *see supra* Parts IV.A.3. and IV.B., respectively, so too must her § 1983 claim against Strange. *See Hardin v. Stynchcomb,* 691 F.2d 1364, 1369, n.16 (11th Cir. 1982) (citing *Whiting v. Jackson State Univ*., 616 F.2d 116, 121 (5th Cir. 1980)).

Therefore, Strange's motion for summary judgment as to Smith's § 1983 claim is also due to be granted.

## V.    CONCLUSION

Based on the foregoing, it is **ORDERED** that the Defendants' Motion for Summary Judgment, (Doc. 51), is **GRANTED**, and this case is dismissed with prejudice.

A separate judgment shall issue.

DONE, this 16th day of July, 2020.

> _____/s/ R. Austin Huffaker, Jr._____
> R. AUSTIN HUFFAKER, JR.
> UNITED STATES DISTRICT JUDGE